

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. WR-73,484-02

### EX PARTE NEAL HAMPTON ROBBINS, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### CAUSE NO. 98-06-00750-CR(2) IN THE 410TH DISTRICT COURT
### MONTGOMERY COUNTY

**KEASLER, J., filed a dissenting opinion**.

### D I S S E N T I N G   O P I N I O N

We filed and set Neal Robbins's writ application to consider how Texas Code of Criminal Procedure Article 11.073 applies to the facts of his case. The case presents an issue of statutory construction defined by established guidelines to an admittedly awkward statute. However, the Court applies precedent questionably and reaches an incorrect result. The Court interprets the terms "scientific method" and "scientific knowledge" in a manner that reaches an absurd result and relies upon a United Stated Supreme Court case that contradicts legislative intent. Article 11.073's legislative history suggests that its aim is to provide an avenue of relief for those convicted on science or scientific methodology subsequently found

to be unsound, not an individual expert's changed testimony when the underlying science or methodology of that opinion remains valid. The Court's opinion also overlooks a potential substantive and procedural obstacle for Robbins's application, the resolution of which is necessary to grant him relief. For these reasons, I dissent.

### Scientific Method

In construing a statute, we limit our analysis to the plain meaning of the text, unless the language is ambiguous or the plain meaning leads to absurd results that the Legislature could not have possibly intended.[1] When we are called upon to go beyond the plain meaning of the text, we may consider various extratextual factors.[2] Although left unsaid, the Court appears to finds section (d) unambiguous and attempts to define "scientific method" through a dictionary definition. Dictionary definitions are a fine way to define terms because they are ordinarily a reliable and readily available source for a term's plain and ordinary meaning.[3] But the Court's use of the Black's Law Dictionary definition of scientific method leads to an absurd result that the Legislature could not have intended, and from my reading of the statute, did not intend.

To hold that "scientific method," as used in the statute, refers to the universally employed "process of generating hypotheses and testing them through experimentation,

---

[1] *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991).

[2] *Ex parte Rieck*, 144 S.W.3d 510, 512 (Tex. Crim. App. 2004).

[3] *See, e.g.*, *Dobbs v. State*, 434 S.W.3d 166, 171 (Tex. Crim. App. 2014); *Watson v. State*, 369 S.W.3d 865, 870 (Tex. Crim. App. 2012); *Boykin*, 818 S.W.2d at 786.

publication, and republication" undermines the statute's clear intent that the object of the change actually be subject to change. Section (d) requires a change in either the scientific knowledge or method: "whether the scientific knowledge or method on which the relevant scientific evidence is based has changed. . . ." The scientific method generally—"the principles and procedure for the systemic pursuit of knowledge"[4] that instill the necessary rigor of valid discovery—is itself unchanging. Science inevitably changes; the process by which that change occurs does not. Under this definition, the Court frustrates the legislative intent and the purpose of the clear statutory scheme by requiring an inherently static concept to change before relief may be given. This is clearly not what the Legislature intended. The Court's definition of the term drains it of any substantive meaning and renders it a useless term, an interpretative result we historically are loathe to reach.[5] When section (d) is read as a whole, the more accurate definition of scientific method (and the more consistent with the apparent legislative intent) is the scientific methodology used in a particular area of scientific study. I do agree with the Court's conclusion that there is no evidence to suggest that the methods for analyzing the cause of child death have changed in the scientific community. In other words, the accepted science and methodology have not changed.

---

[4] "Scientific Method." *Merriam-Webster.com*, http://www.merriam-webster.com/dictionary/scientific method (last visited October 8, 2014).

[5] *See, e.g., Clinton v. State*, 354 S.W.3d 795, 801–802 (Tex. Crim. App. 2011); *Garza v. State*, 213 S.W.3d 338, 349 (Tex. Crim. App. 2007) ("We must presume that 'in enacting a statute, the Legislature intends the entire statute to be effective[,]' and did not intend a useless thing.").

## Scientific Knowledge

The Court next sets upon determining whether Dr. Moore's new opinion qualifies as "scientific knowledge . . . on which the relevant scientific evidence is based has changed." The question posed by the Court is, "Moore's conclusion certainly has changed, but does 'scientific knowledge' apply to the knowledge of an individual?"[6] It finds that it does, but it is unclear what path the Court has taken on our established statutory-interpretation roadmap: holding that the term is unambiguous and the common understanding and usage ought to apply, or holding that the term is ambiguous and turning to case law, as an extratexual source, to define the term. Either way, I find the analysis flawed in several respects and disagree with the Court's result.

The Court finds instructive the United States Supreme Court's definition of "scientific knowledge" in its *Daubert* opinion.[7] The majority then summarily concludes that Dr. Moore's new opinion "satisfies the requirements to be called 'scientific knowledge'" because her new opinion is "an inference or assertion supported by appropriate validation based on the scientific method."[8]

The Supreme Court's opinion has no value in defining any of Article 11.073's terms. Not only is there no explicit or implicit reference to *Daubert* in Article 11.073's language,

---

[6] *Ante*, op. at 19.

[7] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) (outlining factors that bear on the admissibility of scientific evidence under Federal Rule of Evidence 702).

[8] *Ante*, op. at 20–21.

*Daubert* itself does not stand for the proposition that expert testimony is necessarily "scientific knowledge" in and of itself. The Court's *Daubert* quotation ends too soon; it should continue as it does in that opinion: "In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." On a more fundamental level, the majority presumes the answer of the question it seeks to resolve—whether this term refers to an individual's personal knowledge or the collective knowledge of the larger scientific community. Comparing Dr. Moore's individual opinion to what the Supreme Court stated was "scientific knowledge" and finding it satisfied merely assumes that scientific knowledge means an individual opinion.

Applying *Daubert*'s definition of scientific knowledge may speak to whether Dr. Moore's new opinion would be admissible under the Texas Rules of Evidence at a trial on the date of Robbins's application—a finding a court must make under section (b)(2)—but it does nothing to define the statutory phrase in section (d). The inclusion of section (b)(2)'s requirement that the relevant scientific evidence be admissible counsels against defining scientific knowledge in this manner. We presume that the Legislature intended each part of a statute to be given effect.[9] Not only has the Court strayed from our statutory-interpretation presumptions, its analysis gets us no closer to a definition.

I would expressly find the term ambiguous because the term's common understanding and usage offers little guidance or limitations. Based on Article 11.073's legislative history,

---

[9] *Garza*, 213 S.W.3d at 349.

I would hold that scientific knowledge for purposes of this article refers to the collective knowledge within a field of study, not an individual's opinion. Judge Cochran's concurrence too looks to the statute's legislative history, but its conclusion is not supported by that history.

In 2009, Senator Whitmire first introduced a bill that was substantively identical to the language found in Article 11.073.[10] The bill contained the phrase in question—"the court shall consider whether the scientific knowledge or method on which the relevant scientific evidence is based has changed." The Senate Research Center's Bill Analysis stated Senator Whitmire's intent was to "prohibit[] a convicting court from denying relief on an authorized application based solely on the applicant's plea, confession, or admission. . . . [and] authorize[] a court to grant relief on the basis of relevant scientific evidence not available at the time of the convicted person's trial."[11]

The House Research Organization's Bill Analysis echoed the same sentiment. However, it went further and expressed the view of the supporters of that bill, who believed that the statute was necessary because "defendants who were wrongfully convicted using these and any debunked science deserve a way to raise their claim before the court[,]" specifically citing changes in the underlying science of arson investigation and matching

---

[10] *Compare* Tex. S.B. 1976, 81st Leg., R.S. (2009) *with* Acts 2013, 83rd Leg., ch. 41 (S.B. 344), § 1 (effective Sept. 1, 2013).

[11] Senate Research Center, Bill Analysis, Tex. S.B. 1976, 81st Leg. R.S. at 1 (2009).

chemical signatures of bullets.[12] To the extent that it is relevant, even the bill's supporters believed that the "scientific knowledge or method" addressed a broader, fundamental change in the underlying science. I agree with Judge Cochran that the bill's emphasis was on "bad science."[13]

After the 2009 bill failed to pass, Senator Whitmire filed the same bill again in 2011,[14] but no testimony nor committee action was taken on it. Action was taken, however, on Representative Pete Gallego's identical companion bill in the House.[15] In taking testimony before the House Criminal Justice Committee, Representative Gallego laid out his bill stating that the legislation's intent is to address science as it moves forward and to "keep up with the times."[16] In his discussion with other committee members, Representative Gallego specifically identified the advancement of arson science and blood-spatter analysis and explained that this legislation would give the court the ability to look at new science.[17] There was no discussion from either the committee members or witnesses supporting the bill that

---

[12] House Research Organization, Bill Analysis, Tex. S.B. 1976, 81st Leg. R.S. at 3 (2009).

[13] *Ante*, op. at 12–13 (Cochran, J., concurring).

[14] Tex. S.B. 317, 82nd Leg., R.S. (2011).

[15] Tex. H.B. 220, 82nd Leg., R.S. (2011).

[16] Hearing on H.B. 220 Before the House of Represenative Committee on Criminal Jurisprudence, 82nd Leg., R.S. (Feb. 22, 2011) *available at* http://www.house.state.tx.us/video-audio/committee-broadcasts/82 (statement from author Rep. Pete Gallego) (self-transcribed).

[17] *Id.*

the design of the legislation was to grant relief based on the change of an expert's opinion absent any significant change in the underlying science or accepted methodology. Again, I agree with Judge Cochran that the bills' emphasis was still on "bad science, not bad scientists."[18]

In 2013, Senator Whitmire once more introduced the bill (in addition to Representative Sylvester Turner's identical companion bill) that ultimately created what is now Article 11.073.[19] However, the previous four years produced little change to the bill's text, and Article 11.073 contains the same substantive provisions as the first bill filed in 2009. At the urging of the Harris County District Attorney's Office, there were only two changes from the 2011 version: (1) changing "discredits" to "contradicts"; and (2) changing "reasonably probable" to the more familiar "upon a preponderance of the evidence" standard.[20] The Senate Research Center's Bill Analysis summarized the bill's intent as "amend[ing] the Code of Criminal Procedure relating to applications for writs of habeas corpus relief based on relevant scientific evidence of false and discredited forensic testimony. . . . Recent examples of such evidence include dog-scent lineups, misinterpreted indicators

---

[18] *Id.* at 13 (Cochran, J., concurring).

[19] Acts 2013, 83rd Leg., ch. 41 (S.B. 344), § 1 (effective Sept. 1, 2013).

[20] Hearing on S.B. 334 Before the Senate Committee on Criminal Justice, 83rd Leg., R.S. (Mar. 12, 2013) (statement from Justin Wood, Harris County Criminal District Attorney's Office).

of arson, and infant trauma."[21]

Judge Cochran's concurring opinion quotes from the "Supporters Say" section of the House Research Organization's Bill Analysis of S.B. 344: "Recent case law and judicial opinion[s] have identified weaknesses in the current habeas corpus statute, noting issues that include the absence of statutory grounds upon which to grant relief, the speed of changing science that serves as the foundation of a conviction, and technical testimony that may change with scientific discovery."[22] Without naming the case specifically, the Bill Analysis clearly references *Robbins I*[23] by describing a case involving a medical examiner's recantation of her trial testimony and this Court's denial of relief.

Several witnesses testified before the Senate Criminal Jurisprudence Committee in support of the bill. Judge Cochran's concurrence points out two: Robbins's counsel on his original writ application and current counsel, and the former District Attorney who prosecuted Robbins and agreed with granting him relief in *Robbins I*. Robbins's counsel was the only witness who directly opined that the statute would apply to a change in an individual expert's opinion. It is also notable that counsel did not reference *Robbins I*. Whatever the effect of committee testimony regarding what a witness believes the bill does and does not do has on a proper legislative-intent analysis, it is undoubtedly at its weakest when the

---

[21] Senate Research Center, Bill Analysis, SB 344, 83rd Leg.

[22] *Ante*, op. at 16 (Cochran, J., concurring).

[23] *Ex parte Robbins*, 360 S.W.3d 446 (Tex. Crim. App. 2011).

testimony we are asked to consider is from an interested party's own representative. Not surprisingly, it is unsatisfying to rely on Robbins's counsel's own testimony to support the conclusion that the Legislature intended the statute to apply to a changed individual's opinion.

Unfortunately, in the Senate, the lack of debate and discussion among the committee members, probing questions directed at the testifying witnesses, and any floor debate substantially hinders our ability to glean real, definitive insight on the Legislature's intent. Judge Cochran's concurrence relies in significant measure on the bill's supporters' opinions. Reviewing witness testimony can, in some instances, serve as a useful source in deciphering legislative intent. Experts in a particular field, or area of the law, can assist committee members in airing issues of concern, providing guidance, and suggesting changes to a pending bill's language. It is not unusual for a committee to take testimony from many witnesses testifying for or against a particular bill offering a number of opinions and concerns. But there is no inherent link between what a witness says about a bill and what the Legislature intends in passing it. I am less inclined to find such testimony helpful from a statutory-interpretation standpoint when the absence of committee members' substantive questions offers no insight on collective legislative concerns and the testimony has no appreciable effect on the bill's language.

The most compelling sources available regarding Article 11.073's enactment are the authors' own statements and the committee members' questions and statements when

discussing the bills. It carries much more weight than the witnesses' opinions expressed in their testimony. In a committee hearing, Senator Whitmire began by stating that S.B. 344 "will amend the Code of Criminal Procedure relating to procedures for applications for writs of habeas corpus based on relevant scientific evidence of false and contradicted forensic testimony utilized in trial to convict an individual." He continued: "Scientific evidence, such as DNA, was not always a factor in determining guilt or innocence. Today, scientific evidence has been the sole determinant of restoring liberty to an innocent person. The writ of habeas corpus is a remedy to be used when any person is restrained of their liberty. The Texas Department of Criminal Justice houses almost 152,000 inmates, and unfortunately some were wrongly convicted."[24] With the exception of the number of inmates, the second part of Senator Whitmire's statement was a verbatim restatement of how the Senate Research Center's Bill Analysis described his intent in proposing S.B. 1976, the original bill he filed in 2009. The Senator's comments do not indicate that he held the same concerns that Judge Cochran ascribes to him.

In support of H.B. 967, an identical companion bill to S.B. 344, Representative Turner was more detailed in his explanation of the bill's intended purpose. He began by stating that when an individual is "convicted based on junk science or critical forensic testimony that is disproved by later scientific advancements, the courts cannot presently agree whether or not

---

[24] Hearing on S.B. 334 Before the Senate Committee on Criminal Justice, 83rd Leg., R.S. (Mar. 12, 2013) *available at* http://www.senate.state.tx.us/avarchive/ ?yr=2013 (statement from author Sen. John Whitmire) (self-transcribed).

the existing law provides a basis for relief."[25]  As examples of disproved science, he specifically identified discredited dog scent line-ups, misinterpreted indicators of arson, and mistaken assumptions about infant trauma.  After Representative Turner's introduction of the bill, there was an exchange between Representatives Turner and Hughes in which Representative Hughes expressed his understanding that the admission of the faulty science may not have been error at trial, but the bill addresses the scenario when "better technology comes along."[26]  The hearing also contained poignant questioning of testifying witness Jeff Blackburn of the Innocence Project of Texas.  Representative Carter sought his  insight on what section (d)'s "ascertainable through the exercise of reasonable diligence" language means and how it would practically apply.  Blackburn responded that it would not  open the flood gates and burden the courts, that it would "kill a lot of fake claims," and "ensure[s] that this law would only apply to new science."[27]  As an example, he cited the "huge changes" in arson science, where before, in his view, it was not even a science.  From Representative Turner's express intent and the comments and questions from the committee members and witnesses alike, it is clear that, while this particular bill was left pending in committee, the

[25]  Hearing on H.B. 967 Before the House of Representatives Committee on Criminal Jurisprudence, 83rd Leg., R.S. (April 23, 2013) *available at* http://www.house. state.tx.us/video-audio/committee-broadcasts/83 (statement from author Rep. Sylvester Turner) (self-transcribed).

[26]  *Id.* (testimony of Rep. Sylvester Turner) (self-transcribed).

[27]  *Id.* (testimony of Jeff Blackburn of the Innocence Project of Texas) (self-transcribed).

proposed legislation targeted past scientific evidence undermined by subsequent advances in the particular field.

Judge Cochran's belief that S.B. 344 aimed to tackle "bad scientific testimony" is contradicted by both Senator Whitmire and Representative Turner's statements, the bill's unchanged language for the past four years, and her own opinion that the 2009 and 2011 bills' emphasis was on "bad science." I find unconvincing Judge Cochran's declaration that the Legislature's intent and the bill's emphasis shifted from "bad science" to now include "bad scientist testimony" without a corresponding change in the bill's language. We can glean something about the Legislature's motivation in the language previously proposed and ultimately passed. If the Legislature intended to enable a court to grant relief on changed expert testimony alone, it could have easily said that. Instead, the legislative history suggests the Legislature's motivation was to provide a clear path to relief from convictions based on methodology and science that were already discredited—advancements in arson detection and dog-scent line-ups—and permit relief in future cases contesting convictions based on antiquated methodology and science. This motivation resulted in the passage of a bill that emphasized changing methodology and science, not an individual's singular opinion.

From the supporters' opinions, Judge Cochran concludes that, "It cannot be doubted that the Legislature had this very case in mind when it debated and enacted what is now Article 11.073."[28] There was no public debate in the true sense, and the conclusion that the

---

[28] *Ante*, op. at 16.

bill's passage was a result of this Court's previous cases is rank speculation. But if the Legislature was spurred into action by the bill supporters' opinions and Judge Cochran's dissenting opinion in *Robbins I* and concurring opinion in *Ex parte Henderson*,[29] why did the Legislature fail to change the bill's four-year-old text—which pre-dated both *Robbins I* and *Henderson*—to specifically provide a clear "jurisprudential mechanism"[30] to address the issue we face today?

If Article 11.073 was intended to be a response to *Robbins I*, it is not very responsive. If we accept the argument that the Legislature was trying to change the result in *Robbins I*, it would have understood the change involved was a subsequent change in the expert's trial testimony, not a change in her field of study. It is reasonable to expect a legislative response to an opinion of this Court based on a particular set of facts to come with equally particular provisions providing an avenue for relief. Explained in more detail below, it is uncertain that the statute even avails Robbins of relief based on the timing of the alleged change in scientific knowledge or method in relation to his previously considered application. What is more, if the intent of Article 11.073 was to redress a perceived wrong in *Robbins I* or more broadly grant relief based on an expert's changed testimony without a change in the underlying science, it is also reasonable to expect the bill's author to say so in laying out the bill in the committee hearing. Neither Senator Whitmire nor Representative Turner

---

[29] 384 S.W.3d 833, 837 (Tex. Crim. 2012) (Cochran, J., concurring).

[30] *Ante*, op. at 14.

mentioned any of these alleged intentions. Instead, both authors expressed the concern Senator Whitmire harbored in 2009—"bad science."

### Potential Implications of Robbins's Original Writ Application

Aside from the definition of "scientific knowledge or method," the statute's text poses greater uncertainty in the statute's application and possibly grave consequences for Robbins's current application. The majority concludes "Moore's opinion labeling cause of death as 'undetermined' was not available at the time of trial because her scientific knowledge has changed since the applicable trial date."[31] But this conclusion does not consider section (d) in its entirety. For the reader's benefit, I reproduce section (d):

> (d) In making a finding as to whether relevant scientific evidence was not ascertainable through the exercise of reasonable diligence on or before a specific date, the court shall consider whether the scientific knowledge or method on which the relevant scientific evidence is based has changed since:
>
> > (1) the applicable trial date or dates, for a determination made with respect to an original application; or
> >
> > (2) the date on which the original application or a previously considered application, as applicable, was filed, for a determination made with respect to a subsequent application.

The statute provides that, to be eligible for relief on an original writ application, the scientific knowledge or method on which the relevant scientific evidence is based must have changed since trial. However, when a court is considering a previously considered application (or any subsequent application), the change must occur after the last application

_____

[31] *Ante*, op. at 21.

was filed.

Robbins's original writ application was filed on June 4, 2007, in which he claimed that Dr. Moore's testimony changed on or about May 13, 2007. This application was denied June 29, 2011. He filed the present application on September 3, 2013. Under our current jurisprudence, the present application would be considered a subsequent application. To find that the relevant scientific evidence was not ascertainable through the exercise of reasonable diligence, a court would have to find that the change in scientific knowledge or method (however that term may be defined) on which the relevant scientific evidence is based has changed after the date he filed his original application.[32] Even if we accept that Dr. Moore's changed individual opinion meets the definition of scientific knowledge or method, it appears that such a change would not satisfy section (d) because it occurred after Robbins's trial and before Robbins's original application, not after. And because a finding on "relevant scientific evidence that was not ascertainable through the exercise of reasonable diligence" is necessary to both the jurisdictional issue to address the merits of a subsequent application under section (c) and to grant relief under section (b)(2), it is an issue that the Court must answer before granting relief. The very presence of this issue questions the Court's holding that Robbins has alleged sufficient facts to bring him within the ambit of Article 11.073.[33]

**Conclusion**

---

[32]  *See* TEX. CODE. CRIM. PROC. art. 11.073(d).

[33]  *See Ex parte Oranday-Garcia*, 410 S.W.3d 865, 867 (Tex. Crim. App. 2013).

Because I find the Court's statutory interpretation flawed and question its omission of any discussion of the potentially fatal substantive and procedural issues for Robbins's application, I dissent.

DATE FILED: November 26, 2014

PUBLISH